## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

GERALD BARRON,          )
                                 )
      Plaintiff,         )
                                 )
v.                          )       **Case No. 2:14-cv-1095-WKW-PWG**
                                 )
AMEX ASSURANCE COMPANY, )
                                 )
      Defendant.       )

## REPORT AND RECOMMENDATION

This matter is before the court on a motion for summary judgment, filed by Defendant AMEX Assurance Company ("AMEX").  (Doc. 24).  Plaintiff asserts claims for breach of contract arising out of AMEX's failure to pay him benefits under his decedent sister's Accident Protection Plan ("APP") policy and Accident Guard ("AG") policy.

## I.   JURISDICTION

Subject matter jurisdiction is conferred by 28 U.S.C. § 1332 as to Plaintiff's causes of action.  The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both.  *See* 28 U.S.C. § 1391. On November 25, 2014, the above-styled matter was referred to the undersigned for review by United States District Judge W. Keith Watkins.  (Doc. 6); *see also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667

(1980); *Jeffrey S. v. State Board of Education of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

A motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"   *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation omitted); *see also* Fed.R.Civ.P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law.").[1]

---

[1]  Effective December 1, 2010, the language of Rule 56(a) was amended. The word "dispute" replaced the word "issue" to "better reflect [ ] the focus of a summary-judgment determination." Fed.R.Civ.P. 56(a), Advisory Committee Notes, 2010 Amendments.

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine [dispute] for trial."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence . . . that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249–50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–1577 (11th Cir. 1990) (quoting *Anderson*, *supra*).

All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Conclusory allegations based on subjective beliefs, however, are insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc***.**, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477

4

U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Importantly, however, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, No. 08-80113, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment."). In particular, summary judgment is inappropriate where the court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (noting a court must not weigh conflicting surveillance nor make credibility determinations when ruling on a motion for summary judgment); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec.21, 2006) (Rule 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility).

5

## III.   BACKGROUND AND STATEMENT OF MATERIAL FACTS[2]

Plaintiff's sister, Rhonda Barron, was an insured at all relevant times under two accidental death policies (APP and AG) issued by AMEX. (Doc. 24-10; Doc. 24-11). Pursuant to the APP policy, Ms. Barron was provided with $50,000 in coverage for accidental death due to an injury. (Doc. 31-10 at p. 2). The APP policy contains a general clause requiring AMEX to pay the maximum amount of the accidental death benefit "[i]f injury to the insured Person results in death within 365 days of the accident that caused the injury." (Doc. 24-10 at p. 3). The APP policy defines "Injury" as follows:

> **Injury** means bodily injury: (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under the Policy is in force; (2) which occurs while such person is participating in a Covered Activity; and (3) which directly (independent of sickness, disease, mental incapacity, bodily infirmity, or any other cause) causes a covered loss.

(Doc. 24-10 at p. 2). In its exclusion clause, the APP policy provides in pertinent part that:

---

[2] The following statements are the "facts" for summary judgment purposes only, and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir.1994). The court has gleaned these statements from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

No coverage shall be provided under the Policy and no payment shall be made for any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of any of the following excluded risks even if the proximate cause of the loss is an accidental bodily injury.

. . .

2.    Sickness, or disease, mental incapacity or bodily infirmity whether the loss results directly or indirectly from any of these[.]

(Doc. 24-10 at p. 5).

Pursuant to the AG policy, Ms. Barron was provided with $100,000 in coverage for accidental death due to an injury.  (Doc. 31-10 at p. 2).  Similar to the APP policy, the AG policy contains a general clause requiring AMEX to pay the amount of the accidental death benefit selected "[i]f a Covered Person dies as a result of an Accident."  (Doc. 24-11 at p. 5).  Likewise, in its list of exclusions, the AG policy provided in pertinent part that:

The benefits under this Policy will not be paid if the loss for which the coverage is sought was directly or indirectly, wholly or partially, contributed to or caused by any of the following:

. . .

6.    Any disease, illness or infirmity[.]

(Doc. 24-11 at p. 9).

7

On July 18, 2013, Ms. Barron was transported by ambulance to Elmore Community Hospital.  (Doc. 24-2 at p. 2).  According to the EMT records, Ms. Barron was found lying on her bed with extreme weakness, shortness of breath, mental confusion, and no ability to walk.  (Doc. 24-2 at p. 2).  While at the hospital, a chest x-ray was taken of Ms. Barron, which revealed evidence of severe Chronic Obstructive Pulmonary Disease ("COPD") as well as Congestive Heart Failure ("CHF").  (Doc. 24-3 at p. 2).  Hospital notes further reflected that Ms. Barron was unable to stand and was unable to use a walker to ambulate.  (Doc. 24-3 at p. 2).  The hospital's admitting physician, Dr. Bethany Meredith, assessed Ms. Barron as requiring treatment for CHF and an exacerbated COPD.  (Doc. 24-3 at p. 3).  Four days later, Ms. Barron was discharged from the hospital and transferred to Hillview Terrace Health & Rehab ("Hillview"), a rehabilitation and long-term care facility. (Doc. 24-4).

On August 7, 2013, Ms. Barron fell and fractured her right hip, neck, and right wrist.  (Doc. 24-5 at p. 2).  She was immediately taken to Jackson Hospital and admitted.  (Doc. 24-5 at p. 2; Doc. 31-9 at p. 21).  The admitting doctor noted that Ms. Barron was in a "very debilitating condition" and suffered from COPD.  (Doc. 24-6 at p. 2).  On August 8, 2013, Ms. Barron's right hip fracture was surgically repaired through an open reduction, internal fixation procedure.  (Doc. 24-7 at pp 2-

4).  Her other fractures were treated through "nonoperative management."  (Doc. 24-7 at p. 2).  After experiencing no complications from the surgery, Ms. Barron was discharged from the hospital on August 12, 2013, and transferred back to Hillview. (Doc. 24-6 at 2).

Ms. Barron died on September 22, 2013, at the age of 73.  (Doc. 24-17 at p. 2). Dr. Spencer Coleman was Ms. Barron's primary care physician.  (Doc. 31-2 at p. 3; Doc. 31-9 at p. 19).  Dr. Coleman assisted in the completion of Ms. Barron's Certificate of Death as her certifying physician.  (Doc. 24-17 at p. 2).  Ms. Barron's death certificate directed her certifying physician to "Sequentially list conditions, if any, leading to the immediate cause [of death].  Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST."  (Doc. 24-17 at p. 2).  Dr. Coleman listed her immediate cause of death as being due to a right hip fracture, with an "approximate interval between onset and death" of six weeks.  (Doc. 24-7 at p. 2).  As underlying or contributory causes of her death, Dr. Coleman listed COPD (with an interval between onset and death of ten years) followed by coronary heart disease (with an interval between onset and death of five years.  (Doc. 24-7 at p. 2).  Dr. Coleman further certified that Ms. Barron's injury occurred by falling while getting out of bed into a wheelchair at Hillview and that the "Manner of Death" was by "Accident."  (Doc. 24-7 at p. 2).

After Ms. Barron's death, her family filed for accidental death benefits under both the APP and AG policies.  (Doc. 31-10 at pp. 2-3).  Plaintiff was the named beneficiary under each policy.  (Doc. 31-10 at p. 2).  AMEX's insurance adjuster, Jeff Walker, obtained the relevant medical records with regard to Ms. Barron's death and submitted them for an independent medical review by the Medical Review Institute of America ("MRIOA").  (Doc. 31-10 at pp. 3-4).  Dr. Maroun Tawk, who was board certified in internal medicine, pulmonology, and critical care, was assigned to conduct the review for MRIOA.  (Doc. 31-10 at p. 5).

After reviewing Ms. Barron's medical records, Dr. Tawk submitted his report to AMEX on April 24, 2014.  (Doc. 31-8 at p. 3).  Dr. Tawk opined in the report that Ms. Barron did not die as a result of an accident.  (Doc. 31-3 at p. 7; Doc. 31-10 at p. 6).  Specifically, Dr. Tawk concluded that:

> The patient was deconditioned and tripped on her way to the bathroom while trying to leave the wheelchair.  The patient had a successful repair of the hip fracture on 8/8/13.  The documents submitted did not include any complication related to the fall or the hip repair from 8/8/13 until 9/22/13, the date of her death.  The documentation regarding the last days of the patient's life did not include any evidence that the death was related to the hip fracture.  The patient was struggling to breathe from her end stage [COPD] and severe [CHF].  The patient was on hospice and was getting narcotics and benzodiazepines to help with pain, anxiety, and dyspnea.
>
> In any case, the patient's fall was not the result of "an act of another," not provoked or instigated by the Covered Person.  It was probably

related to an act of the Covered Person caused by disease, illness and
infirmity (the patient has several comorbidities including severe CHF
and COPD and has been deconditioned and malnourished). The patient
was placed on hospice being terminal. Therefore, the death of the
subject in question cannot be considered as accidental death as defined
in the plan language [of both the AG and APP policies].

(Doc. 31-3 at pp. 7-8).

By letters dated April 24, 2014, AMEX Claims Representative Jeff Walker
informed Plaintiff that his claim for accidental death benefits under the APP and AG
policies were denied. (Docs. 31-4 and 31-5). In disagreeing with AMEX's decision,
Plaintiff filed this civil action in which he asserts claims for breach of contract arising
out of AMEX's failure to pay him benefits under the APP and AG policies. (Doc. 1-1
at pp. 5-8).

AMEX retained Dr. Vernard Adams as its expert in this case. (Doc. 31-6).
After reviewing the pertinent medical records and documents, Dr. Adams issued a
report containing his opinion as to Ms. Barron's cause of death:

For the purpose of death certification in a hospice patient, the underlying
cause of death is the condition for which hospice case is instituted. In
the case of Rhonda Barron, that condition is dementia. Therefore, in my
opinion, the underlying cause of Rhonda Barron's death is dementia.

Peripheral vascular disease contributed to her death by way of cerebral
ischemia caused by diversion of arterial flow to the subclavian artery
(subclavian steel) caused by peripheral vascular disease. The ischemia
exacerbated her dementia and is therefore contributory to death.

11

> For medical purposes but not for the purposes of death certification, the immediate cause of death is opiate intoxication and bronchopneumonia, as it is for the majority of hospice patients who are given narcotic opiates as part of terminal care. Similarly, pulmonary emphysema and kyphoscoliosis caused her lungs to be more susceptible to pneumonia by impairing pulmonary toilet, but are not certifiable as causes of death because they came into play after hospice therapy was begun.
>
> The fractures of femur, humerus, and radius contributed to her death by the indirect mechanism of exposing Ms. Barron to a new and unfamiliar environment, and thereby exacerbating her dementia.

(Doc. 31-6 at p. 4). Dr. Adams concluded that "Ms. Barron's death was caused by a combination of disease and trauma." (Doc. 31-6 at pp. 4-5). In Dr. Adams's opinion, Ms. Barron's death was not accidental as defined by the APP and AG policies. (Doc. 31-6 at p. 5).

In his deposition testimony, Dr. Adams clarified that his diagnosis of dementia was culled solely upon his review of the medical record which referenced events after her fall on August 7, 2013. (Doc. 31-13 at p. 8). Dr. Adams testified that he did not review any records that would indicate Ms. Barron "was having any serious problems with cognitive patterns or cognitive function, repetition, anything at all cognitively prior to the fall." (Doc. 31-13 at p. 9). In refusing to characterize Ms. Barron's dementia as being in a passive state before the fall, Dr. Adams remarked that her dementia could easily be missed as it was "at a low enough level that no one thought to do any formal testing for it." (Doc. 31-13 at pp. 12-13).

With regard to the effects of her fall on August 7, 2013, Dr. Adams stated that "[i]t simply caused her dementia to be clinically apparent, or worsen" and that "[t]he fractures themselves did not cause death directly or through a physiological mechanism." (Doc. 31-13 at 14). Dr. Adams agreed that Ms. Barron's primary care physician, Dr. Coleman, did not assess her in 2013 as having dementia and that there is no record on the day she was admitted to Jackson Hospital after falling of being diagnosed with dementia. (Doc. 31-13 at pp. 20-21).

Dr. Adams further testified that hip fractures are often a contributory cause of death by triggering or exacerbating whatever disease the decedent may have. (Doc. 31-13 at pp. 14-15). According to Dr. Adams:

> In those cases, there can be a direct link because a bone fracture will typically release fat into the circulation and create fat emboli in the lungs, which will make the – creates a reaction where the lungs get wetter. So what might have been subclinical [CHF] becomes clinical [CHF]. The lungs get wet. They can get pneumonia.

(Doc. 31-13 at p. 15). Dr. Adams testified that Ms. Barron, while she certainly had fat emboli following the surgery of her hip, such emboli remained subclinical and would not be present six weeks later. (Doc. 31-13 at p. 18).

## IV.    DISCUSSION

In this civil action, Plaintiff asserts claims for breach of contract arising out of AMEX's failure to pay him benefits under Ms. Barron's APP and AG policies. (Doc.

13

1-1 at pp. 5-8). AMEX has filed a motion for summary judgment motion, asserting that no material issues of disputed fact exist to contradict that "Ms. Barron's death was caused or contributed to by disease, illness and infirmity." (Doc. 24-1 at p. 5). Thus, according to AMEX, there is no coverage under the policies because her death was not caused directly by accident. (Doc. 24-1 at p. 5).

Plaintiff has the burden of proving that Ms. Barron's death was caused by accidental means and is independent of sickness, disease, mental incapacity, bodily infirmity, or any other such cause. *See Estate of Mary Rogers v. Globe Life and Accident Ins. Co.*, No. 2:13-cv-02013-LSC, 2015 WL 412919, at *3 (N.D. Ala. Jan. 30, 2015). "A prima facie case is made when the plaintiff shows (1) the issuance of the policy, (2) death by accidental means and (3) notice to the insurer." *Id.* (internal quotations and citation omitted). An official death certificate constitutes *prima facie* evidence as to a person's cause of death. *Id.*; *Poole v. Life & Casualty Ins. Co. of Tenn.*, 256 So. 2d 193, 196 (Ala. Civ. Ct. 1971). "[W]here the evidence is conflicting as to whether an accident was the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented." *Liberty Nat. Life Ins. Co. v. Reid*, 158 So. 2d 667, 674 (Ala. 1963).

14

## A.    Non-disclosure of a Medical Expert

AMEX contends that Plaintiff did not make a medical expert disclosure in a timely fashion and has otherwise not offered an expert medical opinion on the issue of cause of death.  (Doc. 24-1 at p. 8).  Pursuant to the Third Amended Scheduling Order, the court ordered Plaintiff to disclose any expert witnesses no later than February 12, 2016.  (Doc. 23 at p. 2).  Plaintiff did not serve any expert disclosures. Because Plaintiff has failed to disclose a medical expert who would testify as to cause of death, AMEX argues that Plaintiff cannot meet his burden of proof that Ms. Barron's death was due to an accident.  (Doc. 24-1 at p. 9).  Plaintiff responds, however, that he is not required to obtain expert evidence to support the cause of death as the death certificate "is prima facie evidence of the facts stated therein and is admissible as presumptive proof of the cause of death."  (Doc. 31 at p. 13).

AMEX relies on *Phillips v. Alamed Co.*, 588 So. 2d 463 (Ala. 1991), when arguing that Plaintiff must present medical evidence through the disclosure of his own medical expert as to what proximately caused Ms. Barron's death.  (Doc. 24-1 at p. 6).  In *Phillips*, the Alabama Supreme Court explained the distinction between the question of what is the cause of a person's death as compared to the question of proximate cause of death.  *Id.* at 465.  Even though a non-physician may testify as to

the cause of death, the issue of proximate cause of death requires the testimony of a physician as it "is clearly a question involving complex medical issues." *Id.* at 465.

The Alabama Supreme Court in *Phillips* does not hold, as AMEX seems to argue, that Plaintiff's failure to name a medical expert automatically precludes him from meeting his burden of proof in an action seeking accidental death benefits. While Plaintiff has not disclosed a medical expert, he does rely on the contents of the death certificate, which was completed by Ms. Barron's treating physician, and testimony from both AMEX's medical expert and Dr. Tawk[3] in an effort to show that Ms. Barron's accident was the proximate cause of her death. It is therefore necessary to examine the medical evidence submitted to determine whether AMEX is entitled to summary judgment as a matter of law.

## B.    The Death Certificate and the "Chain Reaction" Theory

According to AMEX, the medical evidence presented is uncontradicted that Ms. Barron's multiple health issues caused or contributed to her death. (Doc. 24-1at

---

[3] AMEX argues that Plaintiff is improperly attempting to use Dr. Tawk's testimony as expert medical proof because he neither provided a report from Dr. Tawk under Federal Rule of Civil Procedure 26 nor disclosed him as an expert witness. (Doc. 34 at pp. 12-13). AMEX further points out that it did not name Dr. Tauk as an expert and that Dr. Tauk was hired by MRIOA to conduct an independent medical review of Ms. Barron's death to determine whether Plaintiff was entitled to accidental death benefits. AMEX does not formally move the court to strike Dr. Tauk's testimony but instead merely argues that Plaintiff should not be able to introduce or rely on Dr. Tauk's medical opinions or testimony. (Doc. 34 at pp. 12-13). While it does appear that AMEX's contention is technically correct, the court's consideration of Dr. Tauk's medical opinions and testimony below does not serve to prejudice AMEX.

pp. 7-8).  Amex contends that: (1) Ms. Barron's death certificate reflects that serious health issues were contributing causes to her death; and (2) AMEX's expert, Dr. Adams, opined that Ms. Barron's death was due to disease and that her fall was only an indirect cause of her death.  (Doc. 24-1 at pp. 7-8).

Plaintiff counters that numerous issues of material facts exist, and the coverage question presented . . . is a jury question." (Doc. 31 at p. 2).  According to Plaintiff, the death certificate lists Ms. Barron's right hip fracture as the immediate cause of death and such evidence constitutes "presumptive proof of the cause of death." (Doc. 31 at pp. 13-14).  Plaintiff further contends that there is no evidence to show that her COPD, coronary artery disease, or "alleged dementia was of such a character as to endanger her life, apart from the accident." (Doc. 31 at p. 15).  Plaintiff primarily relies on a "chain reaction" theory in arguing that: (1) her COPD, coronary artery disease, and dementia were all dormant prior to her fall; and (2) her fall started a chain reaction resulting in her death." (Doc. 31 at pp. 15-21).

AMEX replies that Ms. Barron's death certificate, in addition to listing her fall as the cause of death, also lists COPD and coronary heart disease as underlying causes of her death.  (Doc. 34 at pp. 4-6).  AMEX also argues that the evidence does not support Plaintiff's "chain reaction" theory because: (1) Plaintiff has offered "no expert medical testimony to show a link between Ms. Barron's fall and an

exacerbation of her symptoms;" and (2) "the medical evidence indisputably shows that Ms. Barron's conditions were 'active.'" (Doc. 34 at pp. 7-10). AMEX maintains that Plaintiff has made an unsuccessful attempt "to establish through [AMEX's] expert witness and through a non-disclosed medical expert that Ms. Barron's diseases were 'dormant.'" (Doc. 34 at p. 10).

Even when construing the evidence in the light most favorable to Plaintiff, he has not come forward with sufficient evidence to raise a genuine dispute of material fact as to whether Ms. Barron's accident and a disease cooperated and combined to proximately cause her death. Contrary to Plaintiff's arguments, the contents of the death certificate do not create a factual dispute as to the proximate cause of Ms. Barron's death. While the death certificate lists Ms. Barron's manner of death as an accident and lists her right hip fracture due to fall as the immediate cause of death, it also notes COPD (a condition ongoing for ten years) and coronary heart disease (a condition ongoing for five years) as underlying causes of her death. (Doc. 24-17 at p. 2). The death certificate, therefore, supports the notion that Ms. Barron's accident and diseases cooperated and combined to proximately cause her death.

Furthermore, while listing causes of Ms. Barron's death, the death certificate does not necessarily address the critical question as to the proximate cause of her death, which requires the testimony of physicians. *See Phillips, Inc.*, 588 So. 2d at

465. Dr. Coleman, the physician responsible for completing the death certificate, has not provided testimony to address the proximate cause issue.

Plaintiff seeks application of Alabama's "chain reaction" theory to determine that AMEX is liable on the APP and AG accidental death policies. Each of Plaintiff's accidental death benefit policies contain a "general" and "exclusion" clause.[4]  When an accidental death policy contains both clauses, "Alabama courts have stated that 'no recovery can be had where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident.'" *Forbes v. Reliance Standard Life Ins. Co.,* No. CV-97-1018-P-S, 1999 WL 34793090, at *3 (S.D. Ala. Aug. 23, 1999) (quoting *Wilson v. Liberty Nat'l Life Ins. Co.*, 331 So. 2d 617, 618 (Ala. 1976)).  *See also Collins v. Metropolitan Life Ins. Co.*, 729 F.2d 1402, 1404 (11th Cir. 1984) (explaining that "[i]f an insured has an active disease of such a character as to endanger the insured's life apart from the accident, such a disease is a contributing cause that will bar recovery"); *Liberty Nat. Life Ins. v. Reid*, 158 So.2d 667, 674 (Ala. 1963) (holding that "[w]here a policy contains the additional clause, . . . then if the disease, in cooperation with the accidental injury, is an efficient cause of death, then there can be no recovery").

---

[4]  Alabama courts often refer to the "exclusion" clause as an "additional" clause. *See Collins v. Metropolitan Life Ins. Co.*, 729 F.2d 1402, 1404-05 (11th Cir. 1984).

The effects of the exclusion clause, however, have been limited by the "chain reaction" theory, which is consistent with the long-standing principle that insurance policies should be construed favorably to the insured. *Forbes*, 1999 WL 34793090, at *4. The "chain reaction" theory states, "[i]f . . . an injury starts a chain reaction resulting in death, recovery may be allowed even if one of the links in the chain is old age frailty and some of the links are dormant diseases or physical conditions without which the chain would be broken." *New York Life Ins. Co. v. McGehee*, 260 F.2d 768, 773 (5th Cir. 1958).

In determining the dormancy or efficiency of a potential contributing or cooperating disease, the courts have held that 'mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury is to be regarded as the cause of death.'" *Forbes*, 1999 WL 34793090, at *4 (quoting *First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of the United States*, 144 So. 451, 454 (Ala. 1932).

> [I]n order for a condition to be a disease . . . within the meaning of such a special clause, there must be some ailment or disorder of an established or settled character to which the insured is subject, an ailment or disorder which materially impairs, weakens, or undermines the condition of he insured and is so considerable or significant that it would be characterized as disease or infirmity in the common speech of men. These words do not include a mere frail general condition . . ., a tendency to disease, a temporary weakness nor a normal physical change that inevitably accompanies advancing years.

*Emergency Aid Ins. Co. v. Connell*, 63 So. 2d 603, 605 (Ala. 1952) (citations and internal quotations omitted).

None of the medical evidence presented establishes that a chain reaction starting from the time Plaintiff fell and broke her hip proximately caused her death. Two doctors, Dr. Tawk and Dr. Adams, have completed reports and provided testimony as to the proximate cause of Ms. Barron's death. Dr. Tawk prepared and submitted an independent medical review report to AMEX in which he opined that Ms. Barron did not die as a result of an accident. (Doc. 31-3 at p. 7). Dr. Tawk's report contained the following pertinent findings: (1) Ms. Barron patient had successful hip repair surgery on August 8, 2013 and that no complications were found from the time of the surgery until the date of her death six weeks later; (2) Ms. Barron had several comorbidities including end-stage COPD and CHF at the end of her life; and (3) the patient was on hospice care and was receiving medications to help with pain, anxiety, and dyspnea. (Doc. 31-3 at pp. 7-8).

Dr. Tawk testified that medical records showed Ms. Barron as having end-stage COPD, but that she was "stable for a respiratory standpoint . . . on [the medications] Spirava and Advair." (Doc. 34-2 at pp. 6, 8). At one point in his deposition, however, Dr. Tawk agreed with Plaintiff's counsel's choice of words that Ms. Barron's COPD was dormant around the time she broke her hip. (Doc. 31-8 at p. 18).

However, it is clear that Dr. Tawk was not using the word "dormant" as a legal term of art, but rather to describe her condition as stable through the use of medications. Rather than becoming dormant, "COPD is a progressive disease that makes it hard for the patient to breathe due to reduced airflow in and out of the lungs." *Anderson v. Georgia-Pacific Wood Products, LLC*, 942 F. Supp. 2d 1195, 1200 n.5 (M.D. Ala. Apr. 26, 2013).

Additional medical evidence was presented to show that Ms. Barron's COPD condition was serious and active before her accidental fall.  On July 18, 2013, only three weeks before fracturing her hip, Ms. Barron was transported by ambulance to Elmore Community Hospital after being found lying on her bed with extreme weakness, shortness of breath, mental confusion, and no ability to ambulate.  (Doc. 24-2 at p. 2).   While at the hospital, a chest x-ray was taken of Ms. Barron, which revealed evidence of severe COPD, and the hospital's admitting physician assessed Ms. Barron as requiring treatment for an exacerbated COPD.  (Doc. 24-3 at pp. 2-3).

In addition to her COPD condition, Dr. Tawk testified that Ms. Barron had a "cardiac history and is on nitroglycerine."  (Doc. 31-8 at p. 7).  Hospital notes in connection with her hospital visit on July 18, 2013, also indicate that a chest x-ray revealed CHF and that treatment was necessary for her CHF.  (Doc. 24-2 at pp. 2-2). Dr. Tawk summarized his testimony that Ms. Barron suffered from multiple illnesses

and that "all these comorbidities cannot be ignored as factors contributing to her death." (Doc. 31-8 at p. 19). He offered no opinion that Ms. Barron's fall in any way triggered a subsequent exacerbation of her COPD or any other medical condition.

AMEX's expert, Dr. Adams, also opines that Ms. Barron's death was not the result of fractured hip, but instead caused by other medical conditions. Specifically, in his expert report, Dr. Adams determined that the underlying cause of Ms. Barron's death is dementia. (Doc. 31-6 at p. 4). Dr. Adams further identified various other diseases as contributing factors to her death, including peripheral vascular disease, pulmonary emphysema, kyphoscoliosis, and pneumonia. (Doc. 31-6 at p. 4; Doc. 34-1 at p 4). Dr. Adams concluded that "Ms. Barron's death was caused by a combination of disease and trauma." (Doc. 31-6 at pp. 4-5).

In Dr. Adams's opinion, Ms. Barron's death was not accidental as defined by the APP and AG policies. (Doc. 31-6 at p. 5). He acknowledged that hip fractures are often a contributory cause of death by triggering or exacerbating whatever disease the decedent may have. (Doc. 31-13 at pp. 14-15). However, according to Dr. Adams:

> In those cases, there can be a direct link because a bone fracture will typically release fat into the circulation and create fat emboli in the lungs, which will make the – creates a reaction where the lungs get wetter. So what might have been subclinical [CHF] becomes clinical [CHF]. The lungs get wet. They can get pneumonia.

(Doc. 31-13 at p. 15).  Dr. Adams testified that Ms. Barron, while she certainly had fat emboli following the surgery of her hip, such emboli remained subclinical and would not be present six weeks later.  (Doc. 31-13 at p. 18).  Dr. Adams further remarked that all medical evidence shows that Ms. Barron's hip fracture was treated successfully by surgery.  (Doc. 31-9 at p. 18).  Thus, a fair reading of Dr. Adams's testimony indicates, that while a fracture from an accidental fall may trigger and exacerbate a disease, such a "chain reaction" did not happen in Ms. Barron's case.

Plaintiff cites several cases in which accidental death benefits were awarded following determinations that an accident was the proximate cause for the death and that any pre-existing diseases or illnesses were deemed to be dormant.  First, in *Metro Life Ins. Co. v. Nichols*, 393 So. 2d 966 (Ala. 1981), the insured fell at work on January 13 ,1976, and broke her hip.  *Id.* at 967.  She underwent surgery the next day and was released from the hospital on January 28.  *Id.*  In the following months, the insured suffered two cerebral hemorrhages, after which her condition deteriorated until her death on April 2.  *Id.*  The insured's accidental death insurance policy contained a general and additional clause similar to the clauses present in the APP and AG policies.  *Id.*  Medical expert depositions were taken, and a jury trial was conducted.  The jury found for the plaintiff on the insurance claim, and a judgment was entered in the amount of $14,700.00.  *Id.*

24

The insurance company appealed, asserting that the trial court's jury instruction with respect to the "chain reaction" theory. *Id.* The Alabama Supreme Court found that the trial court's jury instructions predicated on the "chain reaction" theory was proper in light of the facts of the case. *Id.* at 968. The Alabama Supreme Court concluded:

> Without quoting extensively from the record, we find ample evidence to support a question of fact presentable to the jury based on the "chain reaction" theory. There was expert testimony to the effect that the initial fall, injuries, pain, and other emotional distress could have placed additional demands upon the deceased's circulatory system in such a way as to play a precipitating role in the rupture of the dormant Berry aneurysm. Although none of the medical experts could causally relate the fall to the rupture of the aneurysm, none could conclusively rule it out either. Testimony also established that a Berry aneurysm is congenital in nature and that an aneurysm of this type, without a history of prior leakage, would be termed dormant.

*Id.* at 968.

In *Wilson*, the insured fell down some steps on December 22, 1972, and injured his back. *Wilson*, 331 So. 2d at 618. As a result of his fall, the insured was hospitalized for nineteen days and released on January 19, 1973. *Id.* The insured was subsequently readmitted to the hospital on January 26, 1973, for CHF. *Id.* The insured had suffered for over four years from a serious coronary disease, which was determined to be permanent, progressive, and "associated with a very poor life expectancy for its victims." *Id.* The insured died on January 27, 1972. *Id.* "The

death certificate indicates that the cause of death was arteriosclerotic heart disease with acute myocardial infarction, but it also lists trauma to the back as an aggravating cause of death." *Id.*

The insured's wife filed a civil action seeking to recover under two accidental death policies, which contained the usual general and additional clauses. The trial court granted summary judgment in favor of the insurance company. *Id.* On appeal, the Alabama Supreme Court recognized that, under Alabama procedural law, the plaintiff need only present a "scintilla of evidence" in support of her claim to defeat summary judgment. *Id.* at 620-21. Based on testimony presented by the plaintiff and the insured's doctor, the Alabama Supreme Court determined there was a scintilla of evidence showing that the insured's fall started a chain reaction resulting in death and that his heart condition was in a dormant phase. *Id.* at 621-23.

> The evidence on this issue appears to us to conflicting [sic]. The insured was well before the accident. He had no heart trouble for six months previously. He was doing a full day's work, engaging in normal activities when the accident occurred. After the accident, his physical condition deteriorated rapidly, culminating in his death. The doctor, a cardiologist, who was treating the insured, said he was 'doing quite well until 12-22-72,' the date of the accident, that the accident operated 'indirectly' upon his heart condition be creating tension and anxiety which kept his blood pressure up, which in turn adversely affected his heart disease by putting an increased load on it; that it 'set off' or 'triggered this whole thing', that this 'evolved eventually into' his death in that his heart could not take the increased load.

26

*Id.* at 622.

Third, in *Reid*, the insured died after he fell in the bathtub and suffered both a head injury and severe burns from the hot water. *Reid*, 158 So. 2d at 668. The decedent's beneficiary under his accidental death policies filed an action against the insurance company seeking to recover benefits. *Id.* The policies contained the standard general and exclusion clauses. *Id.* at 673. Medical evidence was presented showing that the insured had suffered from complete heart blockage, which would manifest itself in fainting spells. *Id.*

During the bench trial, several doctors testified that the accident was not the direct cause of death given the insured's severe medical conditions. *Id.* at 670-72. Dr. Alton C. Ochsner, Sr., however, testified that the insured's "heart condition was not a cooperating and efficient cause of death." *Id.* After considering the conflicting testimony, the trial court found in favor of the beneficiary. *Id.* at 668. The Alabama Supreme Court affirmed, finding that the trial court's determination was supported by Dr. Ochsner's testimony. *Id.* at 674.

Plaintiff next cites *McGehee*, in which the insured was a 77-year old blind man who had a history of diabetes, atherosclerosis, heart trouble, and other diseases. *McGehee*, 260 F.2d at 769. On January 5, 1957, the insured fell and skinned his knee after getting out of bed and was subsequently hospitalized. *Id.* After his knee

27

developed an infection and other complications ensued, the insured died sixteen days later. *Id.* A civil action was brought seeking to recover benefits under two accidental death policies which contained general and exclusionary clauses. *Id.*

At trial, medial evidence was presented that each of the insured's diseases was either inactive or dormant for a man of his age. *Id.* at 773. In addition, the insured's personal physician testified that the insured could expect to live another ten years, while the physician performing the autopsy testified that the insured had the body of a "middle-aged man." *Id.* The jury found that the insured's death resulted from an accidental injury and did not result directly or indirectly from disease. *Id.* at 768-69. The Fifth Circuit affirmed, finding that substance evidence was presented to support the verdict. *Id.* at 768-69, 773.

Lastly, in *John Hancock Mut. Life Ins. Co. v. McCreary*, 70 So. 2d 817 (Ala. Ct. App. 1954), the insured suffered severe injuries in an automobile accident and was hospitalized. *McCreary*, 70 So. 2d at 818. The insured had previously been diagnosed with Parkinson's Disease. *Id.* He died during his hospital stay as a result of a pulmonary embolism. *Id.* at 819. The insured's wife sought to recover on the insured's accidental death benefits policy, which contained the standard general and exclusionary clauses. *Id.* at 817.

At trial, the insured's primary care physician testified that the Parkinson Disease was not related to the cause of death, "in that had [the insured] not had Parkinson's Disease, the pulmonary embolism would have killed him, and the embolism would not have developed without some trigger mechanism [like the accident] causing it to develop." *Id.* at 820. The jury found that the insured's accident was the proximate cause of death, and this determination was affirmed on appeal. *Id.*

Each of the cases cited by Plaintiff are materially distinguishable from the factual scenario presented in this case. In these cases where an accident was determined to be the proximate cause of death under a "chain reaction" theory, the plaintiffs successfully introduced expert medical evidence to show that trauma due to an accident was the cause of death and that other health conditions were truly dormant. *See Nichols*, 393 So. 2d at 968; *Wilson*, 331 S. 2d at 621-23; *Reid*, 158 So. 2d at 668; *New McGehee*, 260 F.2d at 773; *McCreary*, 70 So. 2d at 820. In contrast, the expert medical evidence adduced in this case is uncontradicted and demonstrates that Ms. Barron's serious COPD and CHF were active medical conditions requiring medications prior to her falling down and fracturing her hip. *See Collins*, 729 F.2d at 1405(holding that the decedent's asthma condition was not "dormant" within the meaning of the "chain reaction" theory of recovery because the decedent had suffered

an asthma attack prior to his death and was under constant medications for his disease).

Moreover, even if some or all of Plaintiff's medical conditions could be viewed as dormant, he has identified no expert medical opinion to suggest that Ms. Barron's fall was the trigger that activated any of the diseases, such as COPD, that caused her death six weeks later. The fact that Ms. Barron became ill and died six weeks after fracturing her hip does not by itself demonstrate that her fall caused a "chain reaction" leading to her death. Rather, the medical evidence presented shows that Ms. Barron's active COPD and heart conditions were of such an established and significant nature to contribute to her death. Thus, even when construing the facts in a light most favorable to Plaintiff, no genuine issue of disputed fact exists as to whether Ms. Barron's disease or sickness contributed in whole or in pat to her death. Consequently, Plaintiff is not entitled to benefits under the exclusion clauses of the APP and AG policies, and summary judgment is due to be granted in AMEX's favor.

## V.    CONCLUSION AND RECOMMENDATION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that AMEX's motion for summary judgment (Doc. 24) is due to be **GRANTED**.

It is **ORDERED** that the parties shall file any objections to the said Recommendation on or before **June 30, 2016**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).

**DONE** and **ORDERED** this 16th day of June, 2016.

/s/ Paul W. Greene
United States Magistrate Judge